NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220402-U

NO. 4-22-0402

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| DONTERRIUS L. BARNETT, | ) | No. 20CF1366 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding (1) the trial court did not abuse its discretion
in finding that a jailhouse informant's proposed trial testimony was sufficiently
reliable, (2) the cumulative effect of multiple claimed errors did not deprive
defendant of a fair trial where two of the alleged errors did not amount to error
and the third alleged error did not rise to the level of plain error, and (3) defendant
forfeited his challenge to the trial court's method of investigating jury
misconduct, and the court's chosen procedure did not amount to clear or obvious
error.

¶ 2    A jury found defendant, Donterrius L. Barnett, guilty of first degree murder, and

the trial court sentenced him to 65 years' imprisonment. Defendant appeals, arguing (1) the trial

court erred in permitting a jailhouse informant to testify at his trial because the informant's

testimony was not sufficiently reliable under section 115-21 of the Code of Criminal Procedure

of 1963 (Code) (725 ILCS 5/115-21 (West 2020)), (2) the cumulative effect of multiple errors deprived him of a fair trial, and (3) the court abused its discretion in failing to sufficiently investigate whether he was deprived of a fair trial when an alternate juror conducted outside research into the reasonable doubt standard. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In June 2020, defendant was charged with the 2017 murder of Jamie Rogers. Defendant was initially charged with 18 counts of first degree murder (720 ILCS 5/9-l(a)(l), (a)(2) (West 2016)), 1 count of aggravated vehicular hijacking (*id.* § 18-4(a)(4)), and 1 count of unlawful possession of a weapon by a felon (*id.* § 24-1.l(a)). Eventually, all the charges except one count of first degree murder were dismissed upon motion of the State.

¶ 5            A. Pretrial Motion Regarding Jailhouse Informant Testimony

¶ 6            On November 8, 2021, the State filed a motion *in limine* for a hearing pursuant to section 115-21 of the Code (725 ILCS 5/115-21 (West 2020)) to determine the reliability of a jailhouse informant's proposed testimony about statements allegedly made by defendant to the informant. The motion alleged that defendant had been incarcerated in the county jail since his arrest, and he had made incriminating statements to another inmate, Bernard Beard, regarding the charged offenses.

¶ 7            At a status hearing after the motion was filed, defendant stated that Beard had been his "celly" and had taken "half of [his] motion" before moving out of the block. Defendant said he asked for and received another copy of his "motion" after Beard took it.

¶ 8            At a hearing on the State's motion *in limine* on December 17, 2021, Beard testified he met defendant in jail. They were housed in the same pod from March 2021 until June 2021. Approximately 60 inmates were housed in each pod. Beard did not reside in the same cell

- 2 -

as defendant. Beard and defendant did "legal work" together and discussed what was happening in their cases. Beard stated that he had been in jail before and was "pretty savvy" about using the jail's legal resources. Defendant knew Beard was proficient in using these resources, and defendant talked to Beard about the first degree murder charges pending against him. Defendant told Beard "how the situation went down." Between March and June 2021, Beard told his attorney about his conversations with defendant, hoping he would receive consideration from the State in his own cases by disclosing defendant's statements.

¶ 9        Beard identified a handwritten statement that he had given to his attorney approximately one and a half months prior to the hearing, and the trial court admitted it into evidence. In the statement, Beard indicated defendant asked him to assist with the preparation of his defense for his murder case. Defendant told Beard that he had to "pop" Rogers because Rogers thought defendant was "a goofy." Defendant stated he and Rogers planned to rob Rogers's "connect/drug dealer" of money, guns, and three pounds of cannabis. Defendant warned Rogers before the robbery that he would "pop" him if those items were not where Rogers said they would be. Defendant told Beard the night of the incident was not "the first nor the second time [Rogers] had not been right on the where abouts [sic] of a take in a robbery plan." Defendant admitted he shot Rogers outside the house they had planned to rob with a .357-caliber handgun he was carrying. Rogers had a handgun too, and defendant took Rogers's handgun after he shot him.

¶ 10        According to Beard's statement, defendant indicated that, after he shot Rogers, he returned to the house where he had been prior to the attempted robbery. He spoke with a man named "Savyon" at the house. "Savyon" was very upset because Rogers was wearing some of his clothing when he was shot, and he did not want to be implicated. "Savyon" and his girlfriend

went to the scene of the shooting and stripped Rogers's body of the clothing belonging to "Savyon." Defendant told Beard that, after the incident, he gave the gun he used to kill Rogers to a friend who worked at a car wash, and it was later used to shoot another individual.

¶ 11 Beard testified the handwritten statement was a true and correct account of what defendant had told him. Beard had not received any promises from the State before he wrote the statement. He was told to write down what he knew, and the State would read it and possibly give him consideration in his pending cases. He stated he had never recanted or contradicted his statement. He also indicated he had not previously given any statements against other inmates and had not testified against anyone else in the past.

¶ 12 Beard further testified defendant showed him his paper discovery documents on several occasions when they were together in the day room and in defendant's cell, but Beard never took possession of the documents. No one else was present when defendant showed him the documents, though he acknowledged all of the inmates in the pod used the day room. Beard indicated his statement was based on things defendant had told him and there was nothing in his statement he learned solely from viewing the discovery.

¶ 13 According to Beard, while he was in jail with defendant, he had several charges pending against him, including charges of burglary, theft, unlawful possession of title, possession of a stolen vehicle, armed robbery, attempted armed robbery, and aggravated battery. These offenses were charged under 11 different case numbers, and the three armed robbery charges were Class X felonies. The burglary and armed robbery charges stemmed from an incident where Beard stole cigarettes from a gas station while carrying bear spray. Beard stated he committed the offenses because he was a drug addict and was "trying to feed [his] habit."

¶ 14          Beard indicated he entered a plea agreement concerning the pending charges whereby some of the charges were dismissed and he received an aggregate sentence of 8 years' imprisonment on the remaining charges. He was also sentenced to a concurrent term of eight years' imprisonment for charges of aggravated robbery and burglary that were pending in another county. In exchange, Beard agreed to testify truthfully against defendant. Beard acknowledged that if he were to say that his prior statement was not true or that the information in his statement came from police reports instead of from defendant, the State could revoke his plea agreement.

¶ 15          Beard testified concerning his criminal history, and a pretrial services report detailing this history was admitted into evidence. This evidence showed Beard was arrested for theft in 2013, but the charges were later dismissed. In 2014, he was charged with armed robbery and multiple counts of aggravated robbery and retail theft. He was ultimately convicted of one count of retail theft and was sentenced to four years' imprisonment. He was also charged with burglary and retail theft in two additional 2014 cases, but those charges were dismissed pursuant to his guilty plea to retail theft. In 2016, Beard was charged with multiple counts of armed robbery and aggravated robbery. He was convicted of one count of aggravated robbery and sentenced to eight years' imprisonment.

¶ 16          Defense counsel then made a "proffer," stating he dropped off discovery documents for defendant at the jail in March 2021. Later, defendant told counsel he did not receive the documents. Counsel called the jail, and jail personnel could not find them. Counsel then recopied and tendered the discovery documents to defendant. A transcript of a status hearing from April 2021 showed defense counsel had advised the trial court concerning the discovery issue.

¶ 17          The trial court took the matter under advisement. It ultimately granted the State's

motion *in limine*, finding there was "sufficient reliability to allow [Beard] to testify" at trial. The

court noted there would be opportunities for defense counsel to cross-examine Beard concerning

his criminal history and the deal he brokered with the State.

¶ 18                                B. Trial

¶ 19          In February 2022, the matter proceeded to a jury trial on one count of first degree

murder. The State's evidence showed that Rogers's body was discovered on the morning of June

14, 2017. A police officer who responded to the scene testified he observed Rogers's body lying

in an alleyway with an apparent gunshot wound to the head. A pair of shoes was lying in close

proximity to the body, and a glove was "partially on [Rogers's] right hand." An autopsy later

confirmed that Rogers died of a gunshot wound to the head.

¶ 20          Priscilla Dennis testified that Rogers had been her boyfriend. She identified a

photograph of him and stated it was his most recent school picture. The photograph was admitted

into evidence without objection and published to the jury. The prosecutor asked Priscilla to tell

the jury "a little bit about [Rogers]." Pricilla stated Rogers was "a really big talker," outgoing,

enjoyed being outside, enjoyed school, and was "really smart." She said Rogers "just was on the

wrong path."

¶ 21          Marquee Schulz testified that, in June 2017, she lived in the downstairs unit of a

duplex with her mother and her boyfriend, Austin Dennis. James Gaston lived in the upstairs

unit. Defendant was at the duplex frequently, as he was Gaston's friend. On the evening of June

13, 2017, Schulz went to bed at approximately 6 p.m. The next morning, Dennis woke her and

told her how Rogers had been killed earlier that morning. Schulz broke up with Dennis about

three years later, at which point she told the police what Dennis had told her concerning Rogers's death.

¶ 22    Cheyenne Owens testified that on June 13, 2017, she was at Gaston's residence with several other people. Dennis asked to borrow Owens's car to go to a store, and she agreed. Dennis left in her car with two people she later learned were Rogers and defendant. Rogers and defendant were wearing ski masks and gloves. Rogers was carrying a silver revolver with a wooden handle, and defendant was carrying a black handgun. Dennis and defendant returned approximately 30 minutes later, and Dennis said Rogers had gone home. Dennis then went outside and sat on the porch. Owens asked him what was wrong, and he told her what happened.

¶ 23    Dennis testified that on the evening of June 13, 2017, he was "hanging out" with several individuals, including Rogers and defendant, on the porch of the duplex. They were drinking and using drugs. Dennis indicated he was a drug addict at the time. Everyone was discussing committing a robbery, and Rogers said he knew where they could get some money and guns. Defendant, two of defendant's friends, and Rogers came up with a "game plan" for the robbery. Dennis heard defendant say that if anyone was lying, he would kill them. They decided to use Owens's car to commit the robbery, and she would only let Dennis drive it. Defendant's friends had two handguns, and they gave one to defendant and one to Rogers. One was a black Hi-Point and the other was a silver revolver.

¶ 24    Dennis testified he, Rogers, and defendant drove to the house they intended to rob in Owens's car at approximately 2 a.m. on June 14, 2017. They were dressed in black and wearing ski masks. Rogers and defendant exited the car. Approximately five minutes later, Dennis saw two shadows appear and heard a "big bang." He turned and saw defendant holding the revolver in the air. He then saw Rogers "drop." He could not determine Rogers's physical

condition at that time because it was dark. Defendant ran to the car, pointed a handgun at Dennis, and said he would kill Dennis if he "ever said anything." Dennis drove back to the duplex. There, defendant told everyone he shot Rogers and was "kind of like bragging" about it. Dennis testified that he saw defendant holding both handguns after the shooting. However, a police officer later testified that Dennis had previously stated he saw defendant holding one handgun after the shooting and believed the second handgun was in the pocket of defendant's sweatshirt.

¶ 25     The prosecutor asked Dennis if he remembered telling the police that defendant said he shot Rogers because Rogers was lying and defendant was a "big dog." Dennis said he believed that was what defendant said, and it sounded familiar. Dennis stated he sustained severe head trauma approximately one year before the trial, and he had memory problems. Defense counsel asked Dennis if he recalled telling the police in June 2020 that Rogers's head "exploded like a watermelon" when he was shot. Dennis said he did not know "where that came from" because he could not see Rogers at that time. Defense counsel asked Dennis if he "made it up," and Dennis said, "I guess so." An officer later testified Dennis had told him in June 2020 that Rogers's head exploded like a "watermelon bursting" when he was shot.

¶ 26     Jordan Stook testified that she and her boyfriend, Sayvion White, were living in the basement of Schulz's unit in June 2017. On the night of the incident, Stook was at a party at Gaston's unit. She met Rogers for the first time that night. He was approximately 16 years old. Defendant was also at the party. Stook heard several individuals talking about possibly committing a robbery that night. The prosecutor asked Stook if she had previously told the police she heard defendant say he would kill Rogers if he backed out. She initially said she thought defendant said something different, but she then acknowledged her previous statement to police and that it was true. Stook testified she saw defendant on the porch of the duplex the morning

after the party. The prosecutor asked Stook if she heard defendant say anything about the night before. She said she heard defendant say something like, "I had to do it." She was not aware of anyone going to the location of the murder to retrieve clothing from Rogers's body.

¶ 27 Beard testified that he had been housed in the same pod as defendant at the county jail. Beard was known around the pod for doing "law work." Defendant approached Beard on several occasions and discussed his defense in the instant case. Defendant told Beard that Rogers had set up robbery schemes that did not "go through" several times in the past, and the one in instant case "pushed [defendant] overboard." Defendant told Beard he "snapped" and shot Rogers when nothing came of the planned robbery. Defendant said that, during the robbery, he had a silver .357-caliber handgun. Rogers had a "9-millimeter" handgun that belonged to White, which defendant left at the scene with Rogers's body. Defendant returned to the house where he had been before the attempted robbery and told everyone what had happened. White became very angry because Rogers had been wearing his clothing and carrying his handgun. White and his girlfriend subsequently went to the scene to retrieve White's clothing and handgun.

¶ 28 According to Beard, defendant admitted to shooting Rogers approximately eight different times. Beard stated that, during his conversations with defendant, he saw the police reports related to the instant case on at least five occasions. These reports contained witness statements and the victim's name. The police reports were always in defendant's possession when Beard saw them.

¶ 29 Beard testified he had prior convictions for theft, retail theft, aggravated robbery, armed robbery, and aggravated battery. Beard indicated there were several charges pending against him when he was in jail with defendant, and he received a plea deal from the State concerning these charges. Specifically, Beard pled guilty to five counts of burglary, three counts

of aggravated robbery, three counts of aggravated battery, one count of attempted armed robbery, and one count of possession of a stolen motor vehicle. Beard received an aggregate sentence of eight years' imprisonment on all these charges in exchange for his agreement to testify against defendant. Beard indicated that without the plea agreement, he faced multiple sentences of up to 30 years' imprisonment. He acknowledged he would lose his plea deal if he did not testify against defendant, if he were to admit that the information he previously told the prosecutor was not true, or if he were to admit he had acquired the information from the police reports rather than from conversations with defendant.

¶ 30   The jury found defendant guilty of first degree murder. It also found the State had proved defendant personally discharged a firearm that proximately caused Rogers's death.

¶ 31        C. Juror's Possession of a Law Review Article

¶ 32   After the jury found defendant guilty, the trial court held a hearing to advise the parties that the bailiff had found a copy of a law review article with one of the alternate jurors' notes. The law review article was titled, "Beyond a Reasonable Doubt: Juries Don't Get It," by James A. Shapiro and Carl T. Muth. The court stated that the article was not with the jury at the time of deliberations, as it was with an alternate juror's notes. The court stated: "Obviously, it is still contraband. It shouldn't have been there, but it was not in the jury deliberations."

¶ 33   Defense counsel filed a motion for a mistrial, alleging defendant had been deprived of his right to a trial by a fair and impartial jury due to the alternate juror's possession of the law review article. Counsel noted that the article discussed how various jurisdictions defined "beyond a reasonable doubt," and Illinois law specifically forbids defining that phrase for a jury. The motion alleged that the jury violated the trial court's order not to do outside research.

- 10 -

¶ 34    The trial court held a hearing on the motion for a mistrial. The alternate juror in question, whom the court referred to as "Juror 14" throughout the proceedings, appeared with counsel. Juror 14's counsel asked if the court intended to hold the alternate juror in criminal contempt, and the court indicated it did not. The prosecutor indicated the State was not seeking a contempt finding based on what had so far been disclosed. However, the prosecutor indicated that could change if Juror 14's testimony "was to somehow dramatically change what has happened."

¶ 35    A copy of email correspondence between the trial court and Juror 14 in the weeks prior to the hearing was admitted into evidence. The court sent an email to Juror 14 advising her that the bailiff had found a copy of the law review article in her notebook. The court stated it would be holding a hearing to determine what effect, if any, the article had on the jury's verdict, and Juror 14 would need to answer "some questions concerning the circumstances of the article being in [her] possession and whether [she] shared or discussed it with any other juror." Juror 14 sent an email in reply, which stated she had the article in her possession "for reference," but she never got the chance to deliberate because she was an alternate. Juror 14 stated she did not give the article to any other juror to read.

¶ 36    Juror 14 testified that she did not participate in the deliberation process, and she did not think the article would have had any effect on deliberations. She stated she brought the law review article the day after jury selection and kept it in her notebook. The notebook was in her possession throughout the trial, and she always kept it shut during breaks. She did not show the article to any other jurors or discuss with them the information in the article. The trial court asked Juror 14 if she had talked to other jurors about having the article without going into the details of what it said. She replied, "Not to my knowledge, I did not." The court replied, "Okay.

I'm sorry, not to your knowledge—" Juror 14 then stated, "No, I did not. No, ma'am." Juror 14 stated she did not see any other juror with law articles or news articles.

¶ 37    Juror 14 stated she found the article by doing a Google search because she wanted to learn the legal definition of reasonable doubt. She did not discuss the definition of reasonable doubt with any of the other jurors. She understood the judge had instructed the jury not to do any research relating to the case, but she did not believe this meant she could not research the meaning of a legal term. A copy of the law review article was admitted into evidence.

¶ 38    The trial court denied defendant's motion for a mistrial. The court stated the evidence did not show Juror 14's possession of the article had any effect on the outcome of the case. The court noted Juror 14 did not participate in deliberations and she testified she did not share the article with the other jurors.

¶ 39    Following a sentencing hearing, the trial court sentenced defendant to 65 years' imprisonment for first degree murder.

¶ 40    This appeal followed.

¶ 41                              II. ANALYSIS

¶ 42    On appeal, defendant argues (1) the trial court erred in permitting Beard to testify at trial because his testimony was not sufficiently reliable under section 115-21 of the Code (725 ILCS 5/115-21 (West 2020)), (2) the cumulative effect of multiple errors deprived him of a fair trial, and (3) the court erred in failing to sufficiently investigate whether he was deprived of a fair trial when Juror 14 conducted outside research into the reasonable doubt standard. We affirm.

¶ 43                      A. Jailhouse Informant Testimony

¶ 44    We first consider defendant's argument that the trial court abused its discretion in finding Beard's proposed trial testimony was sufficiently reliable. Pursuant to section 115-21 of

the Code (*id.* § 115-21), when the State seeks to introduce testimony of a jailhouse informant concerning incriminating statements allegedly made by a defendant, it must disclose its intent to introduce such evidence at trial and turn over certain evidence to the defendant, including:

"(1) the complete criminal history of the informant;

(2) any deal, promise, inducement, or benefit that the offering party has made or will make in the future to the informant;

(3) the statements made by the accused;

(4) the time and place of the statements, the time and place of their disclosure to law enforcement officials, and the names of all persons who were present when the statements were made;

(5) whether at any time the informant recanted that testimony or statement and, if so, the time and place of the recantation, the nature of the recantation, and the names of the persons who were present at the recantation;

(6) other cases in which the informant testified, provided that the existence of such testimony can be ascertained through reasonable inquiry and whether the informant received any promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; and

(7) any other information relevant to the informant's credibility." 725 ILCS 5/115-21(c) (West 2020).

¶ 45        The trial court then conducts a hearing to determine whether the State has shown by a preponderance of the evidence that the informant's testimony is reliable. *Id.* § 115-21(d). In making its determination, the court shall consider the factors listed in section 115-21(c) and "any other factors relating to reliability." *Id.* § 115-21(d). A trial court's reliability determination

- 13 -

following such a hearing is reviewed under the abuse of discretion standard. *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 138. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 46      Here, defendant argues that five of the statutory factors the trial court was required to consider weighed in favor of finding that Beard's proposed testimony was unreliable—namely: (1) Beard's extensive criminal history, which included several convictions for crimes of dishonesty; (2) the plea deal Beard received from the State; (3) that the information contained in Beard's statement was also contained in police reports Beard had seen; (4) Beard's claim that no one else heard his conversations with defendant even though they occurred in the common area of the jail pod, which "defie[d] common sense"; and (5) other information relating to Beard's credibility. This "other information" included Beard's drug addiction, that he could not remember exactly when his conversations with defendant occurred, that he did not write his statement for several months after his alleged conversations with defendant, and defendant's claim that Beard took half of his discovery. Defendant also argues that Beard's decision not to recant his statement is explained by the deal he received and his testimony that he had not testified as an informant in the past was "questionable."

¶ 47      We find the trial court did not abuse its discretion in finding the State proved by a preponderance of the evidence that Beard's testimony was sufficiently reliable to be admitted at trial. Beard testified that he and defendant were housed in the same pod at the county jail between March 2021 and June 2021, and they discussed defendant's case in defendant's cell and in the day room on several occasions when no one else was around. While Beard testified the day room was shared by many other inmates, we do not find it implausible that defendant and Beard

could have had conversations that were not overheard by others. Beard indicated defendant talked to him about his murder case because defendant was seeking assistance in preparing his defense, and Beard was knowledgeable about the jail's legal resources. While Beard admitted he had viewed defendant's discovery documents on several occasions, he indicated defendant had shown him these documents when defendant was seeking help with his case. Beard testified that nothing in his statement was information he had learned solely from viewing defendant's discovery.

¶ 48        Beard testified that, during his conversations with defendant, defendant admitted he had shot Rogers because Rogers was wrong about the location of a "take" during a robbery they had planned and Rogers had been wrong about such matters multiple times in the past. According to Beard, he told his attorney about his conversations with defendant and began seeking a deal between March 2021 and June 2021, but he did not provide his handwritten statement until several months later. Beard never recanted his statement concerning defendant's admissions to him, and he indicated he had never testified as an informant in prior cases. While Beard had an extensive criminal history and was offered a plea deal by the State in exchange for his testimony, the trial court noted defense counsel would be able to cross-examine Beard concerning these matters at trial. Under these circumstances, we cannot say that the court's finding that Beard's testimony was sufficiently reliable to be admitted at trial was arbitrary, unreasonable, or a view that no reasonable person would take. See *Caffey*, 205 Ill. 2d at 89.

¶ 49        In reaching our holding, we reject defendant's argument that the record shows he stated Beard had taken half of his discovery and that this claim was supported by defense counsel's proffer concerning discovery issues in the case. The record indicates that, at a status hearing, defendant stated that Beard had taken half of his "motion." It is not clear from the

record what document or documents defendant was referring to. Also, defense counsel stated at both a status hearing in April 2021 and at the hearing on the State's motion *in limine*, that defendant did not receive the initial discovery documents counsel tendered and the jail personnel could not find the documents. Counsel did not say defendant received the documents but they subsequently went missing or were taken by someone.

¶ 50    We also reject defendant's argument that Beard's testimony that he had not testified as an informant in the past was "questionable" in light of beneficial plea agreements reached in his prior cases. This argument is completely speculative, as the record contains no information concerning the circumstances surrounding plea deals in any of Beard's prior cases. We also note that the trial court was in the best position to assess the credibility of Beard's testimony on this point, as it had the opportunity to observe Beard's conduct and demeanor while testifying. See *People v. Glover*, 2017 IL App (4th) 160586, ¶ 28 ("The trial court, by virtue of its ability to observe the conduct and demeanor of the witnesses, is in the best position to make credibility determinations.").

¶ 51                                B. Cumulative Error

¶ 52    Defendant next argues the cumulative effect of multiple errors deprived him of a fair trial. Specifically, defendant contends prejudicial errors occurred when (1) the trial court permitted Beard to testify, (2) the prosecutor made "inflammatory remarks" concerning Rogers's young age during opening statements and closing arguments, and (3) the State elicited inflammatory and irrelevant testimony about Rogers from Priscilla Dennis. "[W]hile individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992).

¶ 53    Defendant asserts that his cumulative error argument was not preserved for appeal but argues we may consider his claim under either prong of the plain error doctrine because the alleged errors amounted to clear error, the evidence at his trial was closely balanced, and the cumulative effect of the three errors deprived him of a fair trial. Under the plain error doctrine, a reviewing court may consider unpreserved error when a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step under either prong of the plain error doctrine is to determine whether clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 54    1. *Beard's Testimony*

¶ 55    Defendant contends that error occurred at his trial when the trial court permitted Beard to testify as an informant. We have already found the court did not abuse its discretion by permitting Beard to testify. *Supra* ¶¶ 47-48. Accordingly, we find no error occurred in the admission of Beard's testimony.

¶ 56    2. *References to Rogers's Age*

¶ 57    Defendant argues that error occurred when the State improperly referenced Rogers's youth during opening statement and closing argument, as his age had no relevance to the charged offense. Specifically, defendant notes the prosecutor stated during opening statements that "16-year-old Jamie Rogers lost his life" on the morning of the incident because defendant had taken his life "brutally and senselessly." Defendant also notes that during closing argument, the prosecutor stated that "the death of 16-year-old Jamie Rogers was brutal and

senseless." The prosecutor also stated: "You heard from Priscilla. Jamie's a 16-year-old boy. He's a big talker. He's around a bunch of men."

¶ 58        "The State is allowed to comment on what the expected evidence will be and reasonable inferences therefrom in opening statements [citation] and is given wide latitude in closing argument." *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). However, it is improper for a prosecutor to say anything during closing argument "the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *People v. Smith*, 141 Ill. 2d 40, 60 (1990). Courts have found remarks concerning a victim's age during closing argument to be inflammatory and improper when the State argues the victim was a member of a class in need of extra protection due the victim's age. See *People v. Liner*, 356 Ill. App. 3d 284, 296-98 (2005) (holding that the prosecutor's comments concerning the six-year-old victim's age and the need to make the county safer for every child in every home were inflammatory because the prosecutor improperly argued the victim was a member of a sympathetic class and that the defendant should be convicted due to the need to protect children); *People v. Clark*, 335 Ill. App. 3d 758, 765 (2002) (holding that the prosecutor's remarks were improper where such remarks were not mere references to the victim's age but were rather an argument that the defendant should be convicted due to the need to protect the elderly).

¶ 59        In the instant case, the State merely referenced Rogers's age during opening statement and closing argument. The State did not make any inflammatory commentary concerning Rogers's age, argue that Rogers was a member of a sympathetic class due to his youth, or argue that the jury should convict defendant due to the need protect children or

teenagers. Accordingly, we find the prosecutor's references to Rogers's age were not inflammatory and did not amount to clear or obvious error.

¶ 60                           3. *Priscilla Dennis's Testimony*

¶ 61           Defendant also argues that Priscilla's testimony concerning Rogers's character was improper because it was irrelevant, had no probative value, and its sole purpose was to make Rogers seem more sympathetic. Even if we were to accept defendant's argument that Priscilla's testimony concerning Rogers's personal characteristics amounted to clear or obvious error, the admission of this testimony did not amount to plain error under either prong of the plain error doctrine.

¶ 62           The admission of Priscilla's testimony was not an error "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process" (*Piatkowski*, 225 Ill. 2d at 565) such that it rose to the level of second-prong plain error. Her testimony describing Rogers's interests and characteristics was brief, was not objected to by defense counsel, and was an insignificant part of the State's case. During closing argument, the prosecutor noted Priscilla's testimony that Rogers was a "big talker" but did not otherwise comment on her testimony. Significantly, Priscilla's testimony concerning Rogers's personal characteristics was not presented in such a manner as to cause the jury to believe that it was material to defendant's guilt. See *People v. Felder*, 224 Ill. App. 3d 744, 758-59 (1992) (holding that the defendant was not deprived of his right to a fair trial due to the admission of evidence concerning the victim's age and family where the evidence was incidental and was not presented in such a manner as to cause the jury to believe it was material to the defendant's guilt).

¶ 63           Also, the evidence in this case was not closely balanced such that the first prong of the plain error doctrine applies. Under the first prong of the plain error doctrine, we may

consider unpreserved error when a clear or obvious error occurred and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Piatkowski*, 225 Ill. 2d at 565. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 64    Here, the State's witnesses gave a largely consistent account of the offense. Dennis testified he drove defendant and Rogers to a location where they planned to commit a robbery. Rogers and defendant exited the car, and Dennis heard a gunshot a few minutes later. Dennis then saw defendant holding a gun and saw Rogers fall to the ground. While Dennis was the only eyewitness to the offense, Owens corroborated Dennis's testimony that he left the party with defendant and Rogers, they were wearing masks and carrying guns, and only Dennis and defendant returned to the party. Stook corroborated Dennis's testimony that several individuals at the party, including defendant, were planning a robbery that night. Both Dennis and Stook testified they heard defendant make threatening remarks on the night of the incident. Also, Beard testified that defendant admitted to him multiple times that he had shot Rogers. While Beard's jailhouse informant testimony must be viewed with caution, "the testimony of jailhouse informants is not to be viewed as inherently unbelievable." *People v. Belknap*, 2014 IL 117094, ¶ 55.

¶ 65    While there were some inconsistencies between the testimonies of the State's witnesses and between the witnesses' trial testimonies and prior statements, their accounts of the evening of the incident were largely consistent. Also, while the State's case depended on the credibility of its witnesses, the case did not amount to a "contest of credibility," as defendant

contends on appeal, because defendant did not present a competing version of the events on the evening of the incident. See *People v. Naylor*, 229 Ill. 2d 584, 606-09 (2008) (holding that the evidence was closely balanced and amounted to a contest of credibility where two police officers and the defendant gave credible but different accounts of the incident and there was no extrinsic evidence supporting either version). Accordingly, we conclude the evidence in this case was not closely balanced.

¶ 66        Thus, because two of the three alleged errors asserted by defendant in his cumulative error argument do not constitute clear or obvious error and the third claimed error does not rise to the level of plain error, defendant cannot establish plain error with regard to his cumulative error claim.

¶ 67                                    C. Juror Misconduct

¶ 68        Defendant argues that the trial court erred by failing to sufficiently investigate whether he was deprived of a fair trial before an impartial jury when Juror 14 possessed a law review article defining "beyond a reasonable doubt." Defendant contends the court had a duty to contact all the jurors to determine whether they were made aware of the law review article because Juror 14 could not state with certainty whether any of the other jurors had seen the article. Defendant argues that this court should order a limited remand for an evidentiary hearing to determine whether any of the other jurors knew about the law review article.

¶ 69        Initially, we agree with the State's argument that defendant forfeited this issue by failing to object to the trial court's chosen procedure for investigating Juror 14's possession of the article at either the time of the hearing or in a posttrial motion. See *People v. Lewis*, 234 Ill. 2d 32, 40 (2009) ("Both a contemporaneous objection and a written posttrial motion are required to preserve an issue for review."). Defendant maintains that even if the issue is forfeited, we may

review it under the second prong of the plain error doctrine, which allows us to consider an unpreserved error when a clear or obvious error occurs and the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565. The first step in plain error analysis in determining whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 70        " '[A] trial judge is vested with broad discretion in responding to an allegation of jury misconduct ***.' " *People v. Runge*, 234 Ill. 2d 68, 105 (2009) (quoting *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000)); see also *People v. Ward*, 371 Ill. App. 3d 382, 398 (2007) (quoting *People v. Harris*, 123 Ill. 2d 113, 132 (1988)) (" 'The trial court has substantial discretion in determining whether an improper contact with a juror has caused prejudice to the defendant' [citation], and in fashioning the means to investigate improper contact."). Even where extraneous information is brought into the jury room, an inquiry of the jurors is not necessary when the likelihood of influence is very slight. *United States v. Spano*, 421 F.3d 599, 605-606 (2005) (cited approvingly by *Runge*, 234 Ill. 2d at 104). "The applicable standard of review, after the trial judge has made an appropriate inquiry, is an abuse of discretion standard, which recognizes that the trial court has wide discretion in deciding how to handle and respond to allegations of juror bias and misconduct that arise during a trial." *Runge*, 234 Ill. 2d at 105.

¶ 71        Here, no clear or obvious error occurred when the trial court investigated Juror 14's possession of the law review article by questioning only her rather than all the jurors. A bailiff found the law review article in Juror 14's notebook after the trial. Juror 14 testified she had not shared or discussed the article with any other juror, it remained in her notebook throughout the trial, and she did not participate in jury deliberations. Defendant contends Juror

- 22 -

14 could not say with certainty whether other jurors saw the article because she left it in her closed notebook during breaks. However, there was no indication from Juror 14's testimony or any other source that any of the other jurors ever saw the article. While defendant contends Juror 14's testimony lacked credibility because the trial court alerted her in advance of the nature of the questions she would be asked and because she appeared fearful of being punished for misconduct, the court was in the best position to assess her credibility as it was able to observe her demeanor while testifying. See *Glover*, 2017 IL App (4th) 160586, ¶ 28. Under these circumstances, we find the court's failure to conduct further investigation into the matter was not an abuse of discretion.

¶ 72          We reject defendant's reliance on *Runge* and *People v. Luellen*, 2019 IL App (1st) 172019, in support of his argument that the trial court abused its discretion in relying on Juror 14's testimony alone. The *Runge* and *Luellen* courts held the trial courts in those cases acted within their discretion by conducting more extensive inquiries into juror misconduct than the one in the instant case, but neither *Runge* nor *Luellen* stands for the proposition that the trial court abuses its discretion when it fails to question all jurors. See *Runge*, 234 Ill. 2d at 128; *Luellen*, 2019 IL App (1st) 172019, ¶¶ 39-46.

¶ 73          Defendant also cites several federal district and circuit court cases and cases from other State jurisdictions in support of his argument that each juror should have been questioned in the instant case. Decisions from lower federal courts and other state courts are not binding, but they may be considered as persuasive authority when relevant. *Eckhardt v. Idea Factory, LLC*, 2021 IL App (1st) 210813, ¶ 15. However, nonbinding authority has little relevance to the question of whether the trial court committed a clear or obvious error in failing to question all the jurors concerning the law review article, as "[p]lain-error review is reserved for errors that are

clear or obvious based on law that is well settled at the time of trial." (Internal quotation marks omitted.) *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11.

¶ 74 We also reject defendant's argument on appeal that the trial court failed to exercise its discretion because the court's comments showed it had already determined the outcome of the hearing before questioning Juror 14. The court merely remarked that because the law review article was found in the notebook of an alternate juror, the article would not have been present with the other jurors during deliberations. The court extensively questioned Juror 14 concerning whether she had shown the article to other jurors or discussed it with them. The court clearly had not determined the outcome of the hearing before it began.

¶ 75                                III. CONCLUSION

¶ 76 For the reasons stated, we affirm the trial court's judgment.

¶ 77 Affirmed.