2025 IL App (1st) 230634-U

No. 1-23-0634

Order filed November 20, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 12170 |
| | ) | |
| ROMANDO WILLIAMS, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Navarro and Justice Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for first degree murder where the trial court did not abuse its discretion in finding a jailhouse informant's testimony was sufficiently reliable to be admissible at trial. We vacate defendant's sentence and remand for a new sentencing hearing where the trial court failed to adequately admonish defendant regarding waiver of counsel at sentencing.

¶ 2    Following a jury trial, defendant Romando Williams was convicted of first degree murder

(720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 65 years in prison. On appeal, he asserts that

the trial court erred in (1) admitting a jailhouse informant's testimony where the testimony was

unreliable and (2) failing to admonish him as required under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before forcing him to represent himself at his sentencing hearing. For the reasons that follow, we affirm the finding of Mr. Williams's guilt, vacate his sentence, and remand for a new sentencing hearing.

¶ 3 Mr. Williams's conviction arose from the shooting death of Reginald "Taco" Jones on December 31, 2014, in Chicago. As a result of the shooting, Mr. Williams was charged by indictment with six counts of first degree murder, two counts of solicitation of murder, and one count of conspiracy to commit murder. The State's theory of the case was that Mr. Jones had identified Mr. Williams as the person who shot him in April 2014, and that Mr. Williams, while in custody awaiting trial for that attempted murder, conspired with three people to pay Mr. Jones not to testify and, when Mr. Jones refused, to have him killed.

¶ 4 Prior to trial, the State indicated its intention to introduce the testimony of a jailhouse informant, Jamie Brown, regarding incriminating statements made by Mr. Williams while Mr. Williams and Mr. Brown were both in the custody of the Cook County Department of Corrections (CCDOC). The State filed a motion pursuant to section 115-21 of the Code of Criminal Procedure of 1963 (Code) (720 ILCS 5/115-21 (West 2020)), requesting a hearing to determine Mr. Brown's reliability. The reliability hearing took place on October 4, 2021.

¶ 5 At the hearing, Mr. Brown testified that he was convicted of Class 4 unlawful possession of a weapon in 1998, Class 1 manufacture and delivery of a controlled substance in 1999, Class 4 possession of a controlled substance in 2001, misdemeanor possession of a controlled substance in 2002, Class 3 burglary in 2006, misdemeanor reckless conduct in 2007, and Class 2 aggravated driving under the influence (DUI) causing death in 2013. Mr. Brown testified that his 2013

conviction was the result of a plea agreement; the most serious charge against him had been felony murder, for which he faced a minimum sentence of 20 years in prison; he had received a negotiated sentence of 8 years in prison; and he had entered into that agreement after providing information regarding a criminal matter in which he was not involved.

¶ 6    While in the CCDOC, Mr. Brown regularly saw and conversed with Mr. Williams. Mr. Williams told Mr. Brown that he was in jail for attempted murder, and that he took wheels off a vehicle belonging to a man called "Taco." Taco knew Mr. Williams took his tires and fought with him at a gas station. After having his memory refreshed by the transcript of his grand jury testimony, Mr. Brown stated that Mr. Williams told him Taco and some other men "beat him up kind of bad."

¶ 7    Mr. Williams further related to Mr. Brown that he "got back at [Taco]" by shooting him, which resulted in Mr. Williams's attempted murder conviction and him being incarcerated. After another memory refresh, Mr. Brown testified that Mr. Williams said he was "trying to kill" Taco and that he shot at Taco "not long" after "they had jumped on him." Mr. Brown testified that he and Mr. Williams had this conversation more than once, and on "multiple occasions" while other unidentified people listened to them.

¶ 8    Mr. Brown also testified that Mr. Williams told him he was attempting to pay Taco not to cooperate. Taco wanted "$10,000 to not be involved with it." Mr. Williams only had $7,500 but Taco "wouldn't take it." Mr. Williams told Taco that if he refused the $7,500, he would "get him out of the way." Mr. Brown and Mr. Williams had this conversation multiple times, but Mr. Brown could not recall if other people were present. Mr. Brown confirmed that they had at some point discussed "this part of the story" with no one else present.

¶ 9    Mr. Brown stated that inmates in Cook County jail had to enter their ID numbers to use the phone, and Mr. Williams "constantly" used the ID numbers of inmates incarcerated for "lesser crimes." The other inmate would enter the ID number and Mr. Williams would dial the number. After having his memory refreshed with his grand jury testimony, Mr. Brown identified "Jefferson Phil," "Parlor," "Trump," "Norman," and "Cordero Robinson" as inmates whose ID numbers Mr. Williams used. While on the phone, Mr. Williams would argue and ask, "why haven't what he's asking them to do been did yet." Mr. Brown understood Mr. Williams to be asking about Taco being "taken care of." Mr. Brown eventually learned Taco had been killed when "word got out in the jail." He then contacted his attorney and gave the attorney "all [his] notes" on what he heard.

¶ 10    In November 2015, Mr. Brown met with the State's Attorney's office and, in April 2016, met with them again with Chicago police officers present. He then entered into the plea agreement in which he pled guilty to aggravated DUI in exchange for his cooperation and testimony in Mr. Williams's case. Mr. Brown denied that he was ever under the influence of drugs or alcohol when speaking with Mr. Williams, members of the State's Attorney's office, or the police, or when pleading guilty, or when testifying before the grand jury. He denied that he told anyone "anything different" than what he had just testified, that he provided information on fellow inmates in any other case, or that he had testified or agreed to testify in any other circumstance.

¶ 11    On cross-examination, Mr. Brown explained that his aggravated DUI conviction resulted from an "accident" in which he was intoxicated and participated in a shooting. Mr. Brown drove away from the scene and struck a woman, killing her. Mr. Brown agreed that other people were "around regularly" when he had conversations with Mr. Williams. However, he could not remember the name of anyone who could corroborate his testimony. Mr. Brown denied that Mr.

Williams ever told him about any plans to hurt anyone or to have someone else harm or kill someone. Mr. Brown agreed that he did not "really know" what Mr. Williams was talking about when "he said that he didn't have what he wanted to get done done," and confirmed that he was only testifying as to what he thought "all this meant." He acknowledged that he took notes on Mr. Williams and four other inmates and explained that he took these notes "[b]ecause it may help me in the end."

¶ 12    Mr. Brown could not recall the names of other people who were present for his conversations with Mr. Williams, explaining, "This was six years ago." He agreed that he "probably" referred to Mr. Williams as "Armando" in his notes and possibly wrote the victim's name as "Flaco." Mr. Brown stated that he was first told he would receive a deal in his own case if he testified against Mr. Williams during his second conversation with members of the State's Attorney's office, when the police were also present. He did not know what he would receive in exchange for his testimony until July 13 or 14, 2016. At the time he entered into the agreement for a sentence of eight years' imprisonment to be served at 85%, he understood that he "was looking at 45 years." He agreed that the reason he offered information about Mr. Williams was so that he would not have to spend the rest of his life in prison.

¶ 13    The trial court found that the State had met its burden by a preponderance of the evidence to show that Mr. Brown was a reliable witness. Noting that Mr. Brown had been subjected to direct and cross-examination, the court found that he "conveyed information that is consistent with the other evidence and the witness statement." The court noted that Mr. Brown had made notes, contacted his attorney, cooperated with the State's Attorney's office, and appeared before the grand jury. The court further found that Mr. Brown had not been impeached. It observed that the

conversations between Mr. Williams and Mr. Brown "occurred over months," in either the day room or jail halls, and at times with other people present. Further, Mr. Brown knew the victim's nickname and facts about the case, and he came forward once he learned that Taco had been killed. The court ruled that Mr. Brown would be allowed to testify at trial.

¶ 14    At trial, the State introduced evidence that, in July 2013, Mr. Jones reported having the rims stolen from his vehicle and, in April 2014, he was shot but survived. He identified Mr. Williams as the person who shot him in a verbal statement, in a handwritten statement, and at a preliminary hearing. Mr. Williams was arrested and admitted to stealing Mr. Jones's rims but denied shooting him. Over the next several months, while in custody awaiting trial for attempted murder, Mr. Williams participated in numerous phone calls with Brianna Smith, who was his girlfriend, and at least two other men. Recordings of various phone calls were published during trial. Ms. Smith testified that she, Mr. Williams, and one of the other men tried to persuade Mr. Jones to take money "for the rims." When Mr. Jones refused, Mr. Williams decided Mr. Jones had to die. Ms. Smith, Mr. Williams, and three other men then made a plan to kill him, with Mr. Williams "calling the shots." On December 31, 2014, a masked gunman shot Mr. Jones 10 times outside the auto shop where he worked, killing him. At trial, Mr. Brown testified consistently with his testimony from the reliability hearing regarding statements Mr. Williams made while in custody. The jury found Mr. Williams guilty of first degree murder.

¶ 15    At the next court call, Mr. Williams's private counsel withdrew from the case due to Mr. Williams's behavior toward her. The trial court appointed the public defender. A few months later, counsel filed a posttrial motion arguing, among other things, that the trial court erred in allowing Mr. Brown to testify. Mr. Williams told the court that counsel had not been listening to him or

doing "anything [he] needed him to do." Mr. Williams asserted he was going to hire another private attorney, whom he identified by name, and stated that the lawyer would be present on the next court date. The court told Mr. Williams it thought his actions were dilatory, but that it would give him one opportunity to obtain new counsel. The court allowed the public defender to withdraw and told Mr. Williams, "If you don't have a lawyer on the next date, sir, you're either going to proceed *pro se* or I'm going to appoint the Public Defender's Office to represent you. We're not going to continue this game."

¶ 16 At the next court date, Mr. Williams appeared without counsel and stated he needed more time to contact a different attorney than the one he had named earlier. The court allowed Mr. Williams 30 days and informed him that, if he had not secured new counsel by then, he would have to proceed on his own. The next month, private counsel did not appear, and the court reappointed the public defender.

¶ 17 A few weeks later, Mr. Williams complained to the court that his counsel was not communicating with him. The court responded that Mr. Williams was being dilatory and it was "not going to continue with these games." Mr. Williams asked to leave the courtroom and was taken to the lockup with a speaker so he could hear the proceedings. The court repeated its belief that Mr. Williams was being dilatory and stated that the hearing on the posttrial motion would proceed. Following arguments, the court denied the motion.

¶ 18 At sentencing, Mr. Williams again indicated that he did not want to be represented by the public defender because they could not "communicate." The trial court responded that it would proceed with sentencing, at which point Mr. Williams objected and stated he did not want to do so "without my lawyer." The court reiterated it was proceeding with the sentencing hearing and

provided Mr. Williams with a copy of the presentence investigation (PSI) report, which it noted was missing information because Mr. Williams had refused to answer the probation officer's questions.

¶ 19    After Mr. Williams read the PSI report, the court told him, "Before we start again, I'm going to tell you that if you want the Public Defender to be with you during the sentencing hearing, I will let him do so, otherwise, we're going to proceed, okay?" Mr. Williams answered that he had already spoken with the court about his attorney three times, became angry, used profanity directed at the court, and stated that, if the court was not going to listen to him, he was not going to talk. When Mr. Williams refused to follow the court's instruction to sit, the court had him removed to the lockup with a microphone. The court also noted that Mr. Williams's conduct was "consistent with his actions in the court ever since his trial has been concluded."

¶ 20    Once the microphone and speaker were in place, the court asked Mr. Williams if he had any amendments or corrections to the PSI report. Mr. Williams refused to answer. The court proceeded to aggravation, during which the State presented five victim impact statements and reviewed Mr. Williams's criminal history. The court then asked Mr. Williams if he wished to present matters in mitigation, but Mr. Williams refused to answer. When the court asked Mr. Williams whether he wanted to make a statement in allocution, he answered no. The court imposed a sentence of 65 years in prison. Mr. Williams filed a timely notice of appeal.

¶ 21    On appeal, Mr. Williams first contends that the trial court abused its discretion in permitting jailhouse informant Mr. Brown's testimony at trial where his testimony was unreliable.

¶ 22    Pursuant to section 115-21 of the Code, when the State seeks to introduce the testimony of a jailhouse informant concerning incriminating statements allegedly made by the defendant while detained or incarcerated, it must disclose:

"(1) the complete criminal history of the informant;

(2) any deal, promise, inducement, or benefit that the offering party has made or will make in the future to the informant;

(3) the statements made by the accused;

(4) the time and place of the statements, the time and place of their disclosure to law enforcement officials, and the names of all persons who were present when the statements were made;

(5) whether at any time the informant recanted that testimony or statement and, if so, the time and place of the recantation, the nature of the recantation, and the names of the persons who were present at the recantation;

(6) other cases in which the informant testified, provided that the existence of such testimony can be ascertained through reasonable inquiry and whether the informant received any promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; and

(7) any other information relevant to the informant's credibility." 725 ILCS 5/115-21(c)(1)-(7) (West 2020).

¶ 23    After the State discloses its intent to introduce informant testimony at trial, the trial court must conduct a hearing to determine whether the State has shown by a preponderance of the evidence that the informant's testimony is reliable. *Id.* § 115-21(d). In making this determination,

the trial court shall consider the factors listed in section 115-21(c) and "any other factors relating to reliability." *Id.* § 115-21(d). The trial court's determination of reliability following such a hearing is reviewed for an abuse of discretion. *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 138. A trial court abuses its discretion only if its ruling " 'is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Id.* (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)).

¶ 24    Mr. Williams argues that at the section 115-21 hearing, the State demonstrated only one factor that weighed in favor of finding Mr. Brown reliable, namely, factor (5), that he did not recant his testimony. Mr. Williams asserts that all the other statutory factors weighed against a finding of reliability as (1) Mr. Brown had an extensive criminal history that included crimes of dishonesty; (2) he had secured an exceptionally favorable plea deal in exchange for his testimony, thereby avoiding what could have been a *de facto* life sentence, and had entered CCDOC with a premeditated plan to take notes on conversations with other inmates in order to obtain such a deal; (3) the statements he relayed could not be verified or corroborated, and he agreed he did not "really know" what Mr. Williams had been talking about during overheard conversations; (4) he did not provide details such as the time and place of Mr. Williams's statements and who else was present when Mr. Williams made them, and his memory had to be refreshed by his grand jury testimony several times; and (6) although he had not testified in any other cases, he had admitted to taking notes on several other inmates in the hope that something beneficial to him "would pan out." Mr. Williams maintains that, based on the totality of the statutory factors, the State failed to meet its burden of proving by a preponderance of the evidence that Mr. Brown was a reliable witness.

¶ 25    After reviewing the record, we find the trial court did not abuse its discretion in finding that the State proved by a preponderance of the evidence that Mr. Brown's testimony was sufficiently reliable to be admitted at trial. See *Serritella*, 2022 IL App (1st) 200072, ¶ 148. At the reliability hearing, the trial court heard evidence regarding each of the factors enumerated in section 115-21. Specifically, Mr. Brown's entire criminal history was presented, including the circumstances of the crime for which he was being detained in CCDOC, and he disclosed the terms of the plea deal he had negotiated with the State. He related statements Mr. Williams had made to him, as well as statements he overheard Mr. Williams make on the phone to others. He testified that Mr. Williams's statements took place on multiple occasions over the span of time they were detained together, acknowledged that he could not recall who else was present during the conversations, stated that he had never told anyone "anything different" than what he had testified to at the hearing, and denied that he had provided informant testimony in any other cases.

¶ 26    Beyond the specific statutory factors, the trial court noted that Mr. Brown was subjected to cross-examination, that he knew the victim's nickname and other facts about the case, and that he "conveyed information that is consistent with the other evidence and the witness statement." In addition, the court observed that Mr. Brown had made notes, cooperated with the State's Attorney's office, testified before the grand jury, and had not been impeached. Based on the totality of the circumstances, the trial court found that Mr. Brown was reliable and could testify at trial.

¶ 27    Despite the fact that jailhouse informants often expect to and do receive consideration on their own charges and sentencing in return for their testimony, our supreme court has held that their testimony is not to be viewed as inherently unbelievable. *People v. Belknap*, 2014 IL 117094, ¶¶ 55, 57. Rather, numerous factors must be taken into consideration by the trial court when

weighing an informant's credibility. *Id.* ¶ 57. Here, the trial court was in a superior position to determine and weigh Mr. Brown's credibility, as it was able to observe his demeanor first-hand. *Serritella*, 2022 IL App (1st) 200072, ¶ 142.

¶ 28 We cannot say that the trial court abused its discretion in finding Mr. Brown sufficiently reliable to testify at trial where it was presented with information regarding each statutory factor and used its wide discretion to take into account additional factors it considered relevant to the determination. *Id.* ¶¶ 137, 142; see also *People v. Barnett*, 2023 IL App (4th) 220402-U, ¶¶ 47-50 (holding that the trial court did not abuse its discretion in finding a jailhouse informant's testimony sufficiently reliable where his testimony was not implausible, he did not recant or testify as an informant in other cases, he was subject to cross-examination concerning his criminal history and plea deal, and the trial court observed his conduct and demeanor while testifying); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes). In this case, the trial court's decision was not arbitrary, fanciful, or unreasonable, and was not a view that no reasonable person would take. See *Serritella*, 2022 IL App (1st) 200072, ¶ 138. Accordingly, we reject Mr. Williams's challenge to the trial court's finding of reliability.

¶ 29 Mr. Williams's second contention on appeal is that, as a matter of plain error, his sentence should be vacated and the cause remanded where the trial court failed to admonish him as required under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before forcing him to represent himself at his sentencing hearing. The State concedes the issue, and we agree.

¶ 30 A trial court may permit a defendant in a criminal case to waive his right to counsel and proceed *pro se* only after first substantially admonishing him in accordance with Rule 401(a).

*People v. Ames*, 2012 IL App (4th) 110513, ¶ 29. Rule 401(a), which is entitled "Waiver of Counsel," provides as follows:

"(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

Whether a trial court substantially complied with Rule 401(a) is a question of law we review *de novo*. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 31    Although a defendant may waive the right to counsel by engaging in misconduct or dilatory tactics over a period of time, "[f]or a trial court to conclude that waiver of counsel by conduct has occurred in the case before it, the court must first comply with the requirements of Rule 401(a), explaining to the defendant what is at stake if his conduct continues." *Ames*, 2012 IL App (4th) 110513, ¶ 38; see also *People v. Lesley*, 2018 IL 122100, ¶ 42 ("waiver by conduct" only occurs after the defendant has received an express warning about his behavior and the consequences of proceeding without counsel). The failure to admonish a defendant pursuant to Rule 401(a) in such circumstances constitutes error. *Ames*, 2012 IL App (4th) 110513, ¶ 38. Moreover, because the

right to counsel is fundamental, this court has held that the issue of whether a trial court has substantially complied with Rule 401(a) is reviewable under the plain error doctrine. *People v. Stoops*, 313 Ill. App. 3d 269, 273 (2000).

¶ 32    Here, it appears that, at sentencing, the trial court made an implicit finding of waiver of counsel by conduct. However, the court did not admonish Mr. Williams pursuant to Rule 401(a). We agree with the parties that this was plain error. As such, the proper remedy is to vacate Mr. Williams's sentence and remand the matter to the trial court for a new sentencing hearing in which Mr. Williams will be represented by counsel or, alternatively, represented by himself if he waives counsel after proper admonishments pursuant to Rule 401(a). See *People v. Bahrs*, 2013 IL App (4th) 110903, ¶ 59.

¶ 33    For the reasons explained above, we affirm the finding of Mr. Williams's guilt, vacate his sentence, and remand for a new sentencing hearing.

¶ 34    Affirmed in part; sentence vacated; remanded.